173 N.J. Super. 590 (1980)
414 A.2d 1363
WILLIAM F. LaPORTE, AND JOHN H. LaPORTE, JR., AS CO-EXECUTORS OF THE ESTATE OF JOHN H. LaPORTE, PLAINTIFFS-APPELLANTS,
v.
CHARLES G. BOTT, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Submitted April 15, 1980.
Decided April 29, 1980.
*591 Before Judges FRITZ, KOLE and LANE.
Podvey & Sachs, attorneys for appellants (Robert L. Podvey, of counsel and on the brief).
McLaughlin, Devin & Mayers, attorneys for respondent (Donald B. Devin on the brief).
The opinion of the court was delivered by KOLE, J.A.D.
The executors of the estate of John H. LaPorte (the estate) instituted this action against Charles G. Bott (Bott), a partner of John H. LaPorte before the latter's death. John H. LaPorte *592 was and Bott is an accountant. The object of the action is to recover damages by reason of Bott's servicing and collecting fees from clients of the former partnership. The estate appeals from an adverse judgment.
After LaPorte died a series of related events and agreements occurred in September 1971. Thus, on or about September 1, 1971, the Bott-LaPorte partnership was dissolved under an agreement between Bott and the estate (hereafter, "the dissolution agreement"). In paragraph 4 of that agreement it was provided that the estate would have (1) exclusive ownership of all records with respect to all accounts and clients of that partnership as of August 31, 1971 and (2) the exclusive right to transfer such records and client lists, as well as the right to service such clients and accounts, to any accounting firm selected by the estate under such terms and conditions as were deemed in the best interests of the estate; and Bott "shall not solicit or service such clients or accounts for a period of five years from the dissolution date [August 31, 1971], without the prior written consent of the executors and the accounting firm or firms succeeding to such clients and accounts." In connection with this agreement Bott and the estate appear to have contemplated two substantially simultaneous agreements: one by the estate with the accounting firm of Herdman and Cranstoun, Penney & Co. (H&C) for the sale and transfer of the former LaPorte partnership client accounts (hereafter, "the LaPorte clients") and the other between Bott and H&C under which Bott would become a partner in H&C as of September 1, 1971. The September 1, 1971 agreement between the estate and H&C (hereafter, "the estate-H&C agreement") required H&C to pay the estate a 15% commission on all sums collected for services rendered to the LaPorte clients listed on a schedule attached to the agreement during the same five-year period set forth in paragraph 4 of the dissolution agreement, September 1, 1971 through August 31, 1976, less certain out-of-pocket expenses described in the agreement and a schedule attached thereto *593 (paragraph 10(a)). Since Bott was not a signatory to the estate-H&C agreement, the trial judge denied plaintiff's application to allow it in evidence.
In so ruling he erred. The proofs and fair inferences therefrom reasonably show that the agreement was part of the fabric of the essentially tripartite contractual transaction that occurred in September 1971 involving the estate, H&C and Bott. Additionally, one of the provisions of such agreement properly could serve as a measure of damages to the estate in the event it was found to have a legally protectible interest as against Bott in the LaPorte clients serviced by Bott after he left the H&C partnership. Further, it contains a list of LaPorte clients that were sold against which those serviced by Bott after he left could be compared.
It is true that when viewed in isolation, essentially for the reasons given by the trial judge, the covenant contained in paragraph 4 of the dissolution agreement by Bott not to solicit or service the clients or accounts of the former partnership with LaPorte for a period of five years from the August 31, 1971 dissolution date, without the prior consent of the estate and the accounting firm succeeding to such clients and accounts, is unenforceable.
But this covenant may not be considered in isolation. It seems to be a facet of an integrated tripartite arrangement in which the LaPorte clients were sold and transferred to H&C and appears to have been designed to protect the estate's rights in those clients for the five-year period involved. Had the estate-H&C agreement been allowed in evidence, there might have been sufficient proof to show that all of the parties to the entire transaction, including the estate and Bott, intended that (1) the estate have a sufficiently protected interest in the clients' accounts it sold to H&C to assure its being compensated in accordance with the estate-H&C agreement for the entire five-year period set forth in that agreement and in the Bott dissolution agreement, and (2) Bott would not have the right to interfere with or limit that interest by servicing, without compensating *594 the estate, any such clients for the balance of that period merely by reason of his having left H&C. So viewed, the noncompetition clause of the dissolution agreement may be enforceable so as to permit the assessment of damages against Bott for a violation thereof after he terminated his relationship with H&C. Indeed, there is evidence that in a conversation with one of the estate's executors Bott recognized this obligation to pay for the LaPorte clients previously served by H&C that he serviced after his departure from H&C.
Thus, the record before us, as expanded by the agreement erroneously excluded from evidence, requires that the series of agreements entered into on or about September 1, 1971 be considered as part of one transaction relating to the same subject matter and in effect as one instrument, and permits the provisions in one to be explained or limited by reference to the other. This is so even though the parties to the documents are not the same provided the several instruments were known to all the parties and were delivered on or about the same time to accomplish an agreed purpose. Schlein v. Gairoard, 127 N.J.L. 358, 360 (E. & A. 1941). See, also, Lawrence v. Tandy & Allen, 14 N.J. 1, 6 (1953). The estate thus appears to have a legally protected pecuniary right, with which Bott may not interfere, in the LaPorte clients. Cf. Tessmar v. Grosner, 23 N.J. 193 (1957); Blut v. Katz, 13 N.J. 374 (1953).
It is evident that paragraph 4 of the dissolution agreement specifically covering the rights of the estate and Bott as a result of the Bott-LaPorte partnership dissolution supersedes the provisions (paragraphs 15 and 16) of the original Bott-LaPorte partnership establishing a 20% commission to cover payment for partnership goodwill to a withdrawing partner  that is, one who withdraws while the partners are alive or a withdrawal resulting by reason of death or disability. See Jones v. Gabrielan, 52 N.J. Super. 563, 575 (App.Div. 1958); Rosenberg v. D. Kaltmann & Co., 28 N.J. Super. 459, 463-464 (Ch.Div. 1953). It is clear from paragraph 15 of the Bott-LaPorte partnership agreement that *595 payment of 20% of all fees received by the partnership or any successor from clients originated by the withdrawing partner was considered "his share of the partnership goodwill." Additionally, it would appear from paragraph 18 of that agreement that upon dissolution of the partnership, payment under paragraph 15 of any amount for a former partner's share of partnership goodwill was not contemplated at all, since on dissolution each partner was to have the sole right to perform future services for partnership clients originated by him and was entitled to the custody of the records relating to such clients.
Since paragraph 4 of the dissolution agreement does not provide for any measure of damages for a violation of Bott's covenant not to solicit or service former partnership clients within the five-year period involved, resort may properly be had for that purpose to the other agreement that is part of the tripartite arrangement, the estate-H&C agreement, and more particularly paragraph 10(a) thereof. In our view the latter provision may be used to establish a measure of damages once it is determined that, as to Bott, the estate has the requisite legally protectible property interest in the fees payable by LaPorte clients serviced during the five-year period in question. As indicated, paragraph 10(a) provides for the payment of 15% of sums collected from LaPorte clients for services rendered during the period September 1, 1971-August 31, 1976, less out-of-pocket expenditures as more fully set forth in that agreement.
The proofs further show that the estate continued to receive payments from H&C on all LaPorte accounts serviced by it in accordance with the estate-H&C agreement. Bott remained as a partner with H&C until December 7, 1973. After that date he admittedly serviced LaPorte clients that apparently were no longer being serviced by H&C. That Bott may not have solicited such clients is of no moment if, in fact, the estate has a claim for damages with respect thereto against Bott. The prohibition in paragraph 4 of the dissolution agreement relates to Bott's *596 soliciting or servicing such clients for five years from the dissolution date without the prior written consent of the estate and H&C. In fact, on September 22, 1971, pursuant to paragraph 4 of the dissolution agreement, the estate gave Bott written permission to solicit or service these clients so long as he was a partner in H&C, in "partial consideration of the covenants contained" in that agreement.
The estate claims damages from Bott only from January 1, 1974 to August 31, 1976  that is, from soon after he left H&C until the end of the five-year period set forth in paragraph 4 of the dissolution agreement. As indicated, Bott admitted servicing specific LaPorte clients from January 1, 1974 to August 31, 1976. He also received therefor apparently gross fees aggregating $42,325 in 1974, $45,715 in 1975 and $40,805 in 1976. These fees were further allocated among each of the clients so served.[1]
From what we have stated it is evident that the trial judge was mistaken in concluding the proofs were so deficient that he was unable, except by way of speculation, to assess damages even if the estate had a claim for relief. It would appear, at least from the record before us, that the estate had presented adequate proof of damages to enable the court to determine that issue or at least to require Bott to present evidence controverting such claimed damages or the extent thereof, such as by showing the out-of-pocket expenditures that should be taken into account. See Kozlowski v. Kozlowski, 80 N.J. 378, 388 (1979); Betenbaugh v. Princeton Hospital, 50 N.J. 390, 393 (1967); Tessmar v. Grosner, supra, 23 N.J. at 203; Rubel & Jensen Corp. v. Rubel, 85 N.J. Super. 27, 40-42 (App.Div. 1964).
We do not agree with Bott that H&C is an indispensable party to this litigation. Full relief may be afforded as to the *597 issues here involved between the present parties without H&C's being made a party. A judgment may be justly made between the estate and Bott without either adjudging or necessarily affecting H&C's interest. R. 4:28-1; Allen v. Du Mont Labs., Inc. v. Marcalus Mfg. Co., 30 N.J. 290, 298 (1959). If further light need be shed on the tripartite arrangement to which we have referred or whether in fact it did exist, or the amount or measure of damages, either party is at liberty to present proofs through H&C witnesses on these matters without making H&C a party.
We note that on this appeal plaintiff does not raise as error the judge's refusal to admit in evidence the estate-H&C agreement. Nevertheless, under the circumstances of this case we consider such refusal to constitute error of such dimension as clearly to have been capable of producing an unjust result and requiring notice of it by us as plain error. R. 2:10-2. Although not too clearly articulated in the trial court by the estate, either by way of proof or otherwise, we are satisfied that the legal theory as to Bott's alleged violation after he left H&C, of the estate's protectable interest in the LaPorte clients sold to H&C, irrespective of the validity of the noncompetition covenant if considered alone, was adequately presented there to warrant our intervention, to the extent provided in this opinion, to assure that substantial justice is achieved. And this is so here even if that legal theory was not presented in the trial court. See Spiegle v. Seaman, 160 N.J. Super. 471, 480-481 (App.Div. 1978); Araujo v. N.J. Natural Gas Co., 62 N.J. Super. 88, 101 (App.Div. 1960), certif. den. 33 N.J. 328 (1960).
We do not hold that the estate has established Bott's liability to it under the tripartite arrangement or that the estate does have a legally protectible interest as against Bott under the proofs presented. We hold merely that the failure to admit the estate-H&C agreement in evidence created a real possibility of an unjust result in the trial court. Had that agreement been before the court, sufficient evidence might have been presented *598 to justify the relief sought by the estate. In that event we assume that Bott might not have been content, either as to liability or damages, with presenting no proofs and merely resting at the end of the estate's case.
Accordingly, we reverse the judgment and remand the matter for a new trial on both liability and damages.
Reversed and remanded. We do not retain jurisdiction.
NOTES
[1] In its brief the estate claims damages from December 7, 1973, when Bott left the H&C partnership. But at trial it stated that it was seeking damages only from and after January 1, 1974. It should be bound by that representation.